## 75145. LUNDY v. STUHR et al.
(363 SE2d 343)

BIRDSONG, Chief Judge.

Summary Judgment — Dog Bite. The facts giving rise to this appeal show that Mr. and Mrs. Stuhr were the owners of an Akita breed dog, a large dog, weighing in excess of 100 pounds. At Christmas time in 1985, the Stuhrs were boarding their dog in a kennel which provided boarding service. The appellant Lundy was a college student who worked during off-school time as a kennel attendant. He had worked at this vocation for several years, from the time he had been a high school student. This being a summary judgment, we will take the facts in the light most favorable to the respondent in determining if

there was presented any unresolved issue of fact. The facts viewed in that light establish that the Stuhrs related to the veterinarian when the dog (Sam) was accepted that Sam was suspicious of females and may be prone to bite. Also Sam was described as an "escape artist" in that he would take any opportunity to escape his confinement. Thus when Sam was placed in a cage "run" in the kennel, a sign was placed on the outside of the cage door with warnings appearing thereon in different colored stickers. These stickers warned that Sam "doesn't like girls," was an "escape artist" and "will bite."

Lundy stated in a deposition that he had been instructed how to handle large and small dogs who attempted to bite and to act in a "fluid" way (i.e., apparently no sudden movements) in order not to excite animals in his care. Lundy also candidly admitted that he had noticed and read the signs on the outside of Sam's cage many times during the several days Sam had been a boarder prior to the attack which ultimately occurred. Lundy had walked and cared for Sam for several days and believed an excellent rapport had been established between himself and the dog. Sam had been placed in his exclusive care inasmuch as the dog was skittish around girls and Lundy was the only male attendant. On the day of the attack, Lundy approached Sam's cage, spoke reassuringly to him and opened the cage door to replace or refill the water bowl inside the cage. Lundy observed the dog at the rear of the cage, tail wagging, ears up, and seated. He then observed the dog moving toward the door (and himself). Lundy apparently took no protective action when he saw the dog moving forward but continued to retrieve the water bowl. The dog then arrived near to Lundy (and the door) whereupon Lundy stood up and put his left arm up. The dog then attacked Lundy and inflicted numerous and severe bites until Lundy was able to drive the dog away with a kick and exit the kennel area.

Based upon these transactions, Lundy filed his complaint against the dog owners, the Stuhrs, alleging the dog was vicious, had a known propensity to bite, and attacked him without warning or provocation. The Stuhrs responded by contending that Lundy assumed the risk of the dangerous exposure to the dog. The trial court granted a motion for summary judgment to the Stuhrs but without assigning any legal basis therefor. It is this grant of summary judgment that forms the ground of this appeal. *Held*:

It is conceded in this appeal of the summary judgment granted the Stuhrs that a sole issue requires resolution, i.e., did the appellant Lundy assume the risk of a dog bite and thus eliminate any issue of liability in the Stuhrs for exposing Lundy to a "vicious" dog?

We commence our consideration of this question by recognizing certain basic experiential facts. It is in the common knowledge of the members of society that even domestic animals, when startled, are

prone to defend themselves by biting. It is an unwise person who approaches an unknown dog and makes gestures toward that dog without first ascertaining the propensities of the dog. That such is common knowledge is manifested in this record by Lundy's concession that he is aware that all dogs, large or small, may bite. It was for this reason that he received special training how to handle dogs and how especially to handle large dogs because of their ability to inflict serious injury. It is also because of the application of this obvious fact that it is generally held: "Ordinarily, there is no duty to give warning to the members of a profession against generally known risks. 'There need be no warning to one in a particular trade or profession against a danger generally known to that trade or profession.' Shearman and Redfield, Negligence, § 656, at page 1576.' And see Annot. 76 ALR2d 9, 28." *Eyster v. Borg-Warner Corp.*, 131 Ga. App. 702, 705 (2) (206 SE2d 668).

In addition to what we, along with the trial court, could accept as the common knowledge of man, the trial court was presented with evidence that Lundy was well aware that this dog could be unpredictable around females, was more likely than some other dogs to attempt to escape from his cage, and even more significantly, that this dog would bite. While Lundy sought to limit the implication that the dog would bite to females, the sign prominently displayed on the exterior of the cage simply stated the dog "Will bite." At the least this logically would require Lundy to exercise special caution to prevent the dog from escaping, to be aware that the dog was unpredictable at least as toward women, and might bite. Lundy's own deposition testimony reflects that he entered the cage and observed the dog in an apparent docile condition. He then observed the dog moving toward either Lundy or the open cage door. Instead of speaking soothingly to the dog or making an attempt to withdraw and close the cage door, Lundy ignored the moving animal until the dog was right at the door and then suddenly stood up and raised his left arm.

We agree with an observation previously made by this court: "The plaintiff went into the situation with his eyes wide open. He saw the whole picture; he had the opportunity to measure the risks, if any, and was under no compulsion [to enter the cage and thereafter ignore the movement of the dog]. . . . Every adult is presumed to be endowed with normal faculties, both mental and physical. [Cit.]" *Simmons v. Classic City Beverages*, 136 Ga. App. 150 (4) (220 SE2d 734). No person should conduct himself in an irresponsible manner when even ordinary prudence would protect him from the likelihood of possible injury. At some point the danger and likelihood of injury becomes so obvious that actual knowledge by the plaintiff is unnecessary. *Union Carbide Corp. v. Holton*, 136 Ga. App. 726, 732 (222 SE2d 105).

" 'Assumption of risk in its simplest and primary sense means that the plaintiff has given his express consent to relieve the defendant of an obligation of conduct toward him and to take his chance of injury from a known risk. "The result is that the defendant is simply under no legal duty to protect the plaintiff. A second, and closely related meaning, is that the plaintiff, with knowledge of the risk has entered voluntarily into some relation with the defendant which necessarily involves it, and so is regarded as tacitly or impliedly agreeing to take his own chances." Prosser, Law of Torts, (2d ed.), p. 303, "Assumption of Risk," § 55. "In working out the distinction the courts have arrived at the conclusion that assumption of risk is a matter of knowledge of the danger and intelligent acquiescence in it, while contributory negligence is a matter of some fault or departure from the standard of reasonable conduct, however unwilling or protesting the plaintiff may be." ' " *Owens-Illinois v. Bryson*, 138 Ga. App. 78, 79-80 (225 SE2d 475). See Prosser, Law of Torts (5th ed.), p. 480, "Assumption of Risk," § 68. Here, the veterinarian voluntarily entered into a contract for care of the Stuhrs' dog, with full knowledge of the risk, and informed his employee via the posting of signs on the dog's run. Knowledge of the danger was apparent and the veterinarian and his assistant acquiesced in it by undertaking care of the dog.

Like the trial court, we will apply the rule that though commonplace issues of negligence and lack of ordinary care for one's own safety normally are not susceptible of summary adjudication either for or against the claimant, in proper circumstances, the trial court can conclude as a matter of law that the facts establish assumption of the risk or contributory negligence on the part of the plaintiff where the evidence is plain, palpable and indisputable. *Manheim Svcs. Corp. v. Connell*, 153 Ga. App. 533, 534 (265 SE2d 862). In such circumstances, the conclusion ultimately must be drawn that known risk is ignored and thus assumed. Such is the case here. We find no error in the grant of summary judgment to the Stuhrs.

*Judgment affirmed. Banke, P. J., Carley, Sognier, Pope, and Benham, JJ., concur. Deen, P. J., McMurray, P. J., and Beasley, J., dissent.*

Deen, Presiding Judge, dissenting.

Dogs, like humans, are sometimes good and sometimes bad. Dogs have on occasion been described as "faithful even in death." See *Turner v. Irvin*, 146 Ga. App. 218, 219 (246 SE2d 127) (1978). On the other hand, dogs in some cases have also been equated with various despicable types of people, e.g., " 'dogs, and sorcerers, and whoremongers, and murderers, and idolaters. . . .' " *Fincher v. Collum*, 2 Ga. App. 740, 743 (59 SE 22) (1907). Regardless of which moral assessment of dogs is more appropriate, the dog owners in the instant case

had knowledge of the dangerous nature of their dog Sam, who weighed over 100 lbs. We have held generally that, if this propensity to bite is known, a jury question is required when the animal actually attacks and bites.

In light of the foregoing considerations, I must respectfully dissent from the majority opinion for the following two reasons. First, the doctrine of assumption of risk does not adequately cover situations such as that in the instant case, wherein appellant Lundy had previously exerted his best effort to establish rapport with the dog and to alleviate its dangerous propensities. The dog's vicious nature, as alleged in the complaint, was clearly demonstrated by his instantaneous transformation from a friendly, tail-wagging pet into a veritable monster the moment he perceived his potential victim to be within easy reach and off guard.

Second, summary adjudication is inappropriate where issues of negligence and lack of ordinary care are involved. These are matters of fact which address themselves to the jury except where the evidence is "plain, palpable, and indisputable." In the instant case there is ample room for dispute: there are evidentiary matters which should be fully examined and explored by impartial jurors. Until these factual matters have been addressed, it is impossible to resolve the dispositive issues in accordance with law and equity. The case of *Simmons v. Classic City Beverages*, 136 Ga. App. 150 (4) (220 SE2d 734) (1975), relied upon by the majority, only involved dealing with and lifting three kegs of beer on the wall or in a two-door draft beer refrigerator. This is quite different from being required as an employee to feed and look after a huge animal with known dangerous propensities, as in the instant case. I would reverse the judgment below and remand the case for jury trial.

I am authorized to state that Judge Beasley joins in this dissent.

DECIDED NOVEMBER 24, 1987.

*Edgar L. Crossett III, Robert P. Crossett*, for appellant.
*L. Bruce Hedrick, Jr., Stephen L. Cotter*, for appellees.